# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| **MINNIE WOOLENS, o/b/o J.W.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case number 4:06cv1705 TCM** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,[1]** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

This 42 U.S.C. § 405(g) action for judicial review of the final decision of Michael J. Astrue, the Commissioner of Social Security ("the Commissioner"), denying the application for supplemental security income benefits ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383b, filed on behalf of Jaycee Woolens ("Plaintiff") by his mother, Minnie Woolens, is before the Court[2] for disposition. Plaintiff has filed a brief in support of his complaint; the Commissioner has filed a brief in support of his answer.

## Procedural History

Ms. Woolens applied for SSI on Plaintiff's behalf in April 2003, alleging he was disabled as of February 1, 2003, due to attention deficit hyperactivity disorder ("ADHD").

---

[1]Mr. Astrue was sworn in as the Commissioner of Social Security on February 12, 2007, and is hereby substituted as defendant pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

[2]The case is before the undersigned United States Magistrate Judge by written consent of the parties. See 28 U.S.C. § 636(c).

(R.[3] at 48-53.)  This application was denied initially and following an administrative hearing in December 2005 before Administrative Law Judge ("ALJ") Thomas C. Muldoon.  (Id. at 13-18, 37-46, 277-87.)  The Appeals Council denied review, effectively adopting the ALJ's decision as the final decision of the Commissioner.  (Id. at 4-6.)

## Testimony Before the ALJ

Ms. Woolens, represented by counsel, was the only witness to testify at the brief administrative hearing.

Ms. Woolens testified that Plaintiff lives with her and five of his older sisters.  (Id. at 280-81.)  He has chores to do at home, and sometimes has to be constantly reminded to them.  (Id. at 286-87.)

Plaintiff was in the sixth grade at Turner Middle School.[4]  (Id. at 281.)  He receives special education services in the form of a resource class.  (Id.)  Reading and math are his most difficult subjects.  (Id. at 281-82.)  His grades are getting better, although his most recent ones are all "Ds."  (Id. at 282.)  Plaintiff has never been held back a grade.  (Id.)  He has difficulty concentrating and maintaining attention on the task at hand.  (Id. at 283.)

Plaintiff had been suspended three times during the recent term.  (Id.)  The first  and third suspensions were for insubordination and disrespect and the second was for fighting.  (Id.)  He has problems with both his peers and adults.  (Id. at 284.)

---

[3]"R." refers to the administrative record filed by the Commissioner with his answer.

[4]Plaintiff was born on February 26, 1994.

Plaintiff is currently taking 36 milligrams of Concerta once a day. (Id.) He has been taking this medication for approximately one year. (Id.) Before this, he took Ritalin. (Id.)

Asked about an allegation that Plaintiff did not always take his medication, Ms. Woolens replied that she did not know where that allegation was coming from because she gave him his medication every day before he went to school. (Id. at 285.) She further testified that the allegation might have arisen when Plaintiff was taking Ritalin because he took that three times a day, one of which was during school hours. (Id.) She speculated that he sometimes did not get the school dose because the nurse was not there. (Id.)

### Medical, School, and Other Records Before the ALJ

When applying for SSI for her son, Ms. Woolens listed February 2003 as when he became disabled. (Id. at 75.) She explained that he constantly had problems if he did not take his medication. (Id.) For instance, he would get out of his chair at school, would leave the room without permission, or would get into a fight. (Id.) This behavior led to suspensions. (Id.)

On another form, she reported that Plaintiff woke up at 7:30 in the morning and took his medicine at 8:00. (Id. at 79.) He sometimes had difficulty going to sleep because of the medicine. (Id.) He was hyperactive and could not sit still or concentrate for long. (Id.) He had problems with reading and spelling. (Id. at 80.) He had chores, i.e., making his bed, folding his clothes, and emptying the trash in the bathroom, and sometimes took awhile to do them. (Id. at 81.) She had to supervise him by sitting with him until the chores were done. (Id.) When he was taking his medication, he obeyed his regular teacher most of the time; he

did not always obey a substitute or other teacher.  (Id.)  Sometimes he got along with children his age and sometimes he got into fights.  (Id. at 82.)  He was taking 20 milligrams of Ritalin three times a day and had been since February 2003.  (Id. at 80.)  His behavior had gotten a little better with the medication.  (Id.)

On a separate form, completed five months after the application was filed, Ms. Woolens reported that Plaintiff did not have any problems seeing, hearing, communicating, doing physical activities, getting along with his teachers, and completing homework.  (Id. at 83-84, 86, 88-89, 91.)  He did have problems reading, comprehending what he had read, getting along with school teachers, playing team sports, accepting criticism or correction, finishing what he starts, working on arts and crafts problems, making friends, and keeping busy on his own.  (Id. at 87, 89, 91.)  When she gave him his medication, he would settle down and complete a task.  (Id. at 91.)

While the application was pending, Ms. Woolens completed another, daily activities report form.  (Id. at 104-07.)  She noted that Plaintiff was "quite a bit calm[er]" now that he was on medication.  (Id. at 104.)  He got along, most of the time, with his ten-year old sister (Plaintiff was then nine years old); however, he frequently argued and fought with his teenage sisters.  (Id.)  Plaintiff was then in the fourth grade and had problems with reading, math, and spelling.  (Id. at 105.)  He was taking Ritalin and was more settled and cooperative.  (Id.)  He fought a lot with children between the ages of eight and twelve years.  (Id. at 107.)

Plaintiff's school records before the ALJ begin when Plaintiff was in the first grade.

When Plaintiff was seven years old and approaching the end of the first grade, he had a formal psychological and educational assessment. (Id. at 137-60.) It was noted that Plaintiff's teacher estimated that he was currently functioning at the kindergarten level in reading and written expression and at the first grade level in mathematics. (Id. at 138.) It was also noted that "[a]lthough [Plaintiff] is developing academically, he does not always follow directions nor does he complete and turn in homework." (Id. at 139.) His teacher rated his behavior as unsatisfactory and reported that Plaintiff's disruptive behavior interfered with his academic progress and that he did not obey class and school roles and did not practice self-control. (Id.) The teacher's estimate of Plaintiff's current cognitive functioning was below average. (Id.) Although Plaintiff was initially cooperative during the examination, his behavior deteriorated and he became increasingly uncooperative and defiant. (Id.) During the 2000/2001 school year, Plaintiff had been suspended five times for a total of fourteen days. (Id. at 142-45.) Each suspension involved him hitting another student. (Id.)

As part of the evaluation for the Individual Education Program ("IEP"), Plaintiff was administered several tests. (Id. at 140-41, 146, 154.) His scores on the Wechsler Intelligence Scale for Children – Third Edition ("WISC-III") indicated a current level of intellectual ability in the average range with a verbal intelligence quotient ("IQ") of 100, a performance IQ of 113, and a full scale IQ of 107. (Id. at 140, 154.) His scores on the Wechsler Individual Achievement Test ("WIAT") indicated a significant difference between his actual scores and his predicted scores based on his IQ. (Id. at 141, 154.) In particular, his reading comprehension score was 79 – a score that exceeded only 8% of students his age – but his

predicted score was 105.  (Id.)  His scores on the Wide Range Achievement Test – Third Revision ("WRAT-3") placed him at the kindergarten level for reading and spelling and the first grade level for arithmetic.  (Id. at 154.)  His score on the Behavior Evaluation Scales ("BES") indicated behavior which was "considered extremely deviant" with "learning problems, interpersonal difficulties, inappropriate behavior, unhappiness/depression, physical symptoms or fears."  (Id. at 146, 155.)  His scores on the Vineland Adaptive Behavior Scales – Interview Edition placed him in the medium to low range for communication, daily living, and socialization skills.  (Id. at 154.)  His adaptive behavior composite placed him at the age equivalent of four and one-half years.  (Id.)

Included in the evaluation was the report of the observations of Plaintiff by his teacher and a school counselor between September 2000 and March 2001.  (Id. at 147-52.)  In the eleven types of behavior under the category of "Work Habits," the eight types of behavior under the category of "Classroom Behaviors," the eleven types of behavior under the category of "Interpersonal Behavior," and the eleven types of behavior under the category of "Intrapersonal Behavior," Plaintiff was rated as having a severe problem in all but five.  (Id. at 147-48.)  He did not have a problem in being tardy to school, in threatening to hurt himself, and in complaining of physical discomfort.  (Id.)  He had a moderate problem in making friends and in taking the property of others.  (Id. at 148.)  His scores in the academic categories of "Listening Comprehension," "Oral Expression," "Basic Reading Skills," "Reading Comprehension," "Written Expression," "Mathematics Calculation," and

"Mathematics Reasoning" ranged from "not a problem" to "severe problem," with the highest concentration of "severe problem" ratings being in the two reading categories. (<u>Id.</u> at 149-52.)

The evaluators concluded that Plaintiff was "Behavior Disordered." (<u>Id.</u> at 158.) Moreover, "[o]bserved behaviors have existed to a marked degree over extensive periods of time in a variety of environments including the educational setting, and adversely affect school functioning and that of the educational program." (<u>Id.</u>)

Another IEP was completed in February 2003 when Plaintiff was in the third grade. (<u>Id.</u> at 121-36.) The diagnosis was "Emotional Disturbance." (<u>Id.</u> at 121.) It was noted that Plaintiff was functioning below grade level in the academic subjects, particularly in reading and developing and writing completing sentences. (<u>Id.</u> at 123.) He was "developing skills in basic math," but was weak in reading comprehension and decoding. (<u>Id.</u>) His failure to comply with class and school rules caused him to be suspended. (<u>Id.</u>) He was defiant and would be verbally and physically aggressive toward adults and peers. (<u>Id.</u>) He was functioning within the average range of intellectual ability. (<u>Id.</u>) The IEP included several accommodations, including preferential seating, extended time, small group testing, and use of a calculator, spelling dictionary, and arithmetic tables. (<u>Id.</u> at 125.) Ms. Woolens was to receive a monthly report on Plaintiff's progress, a five-week report, a quarterly report, and, if needed, telephone calls. (<u>Id.</u> at 128.)

Plaintiff's goals included accepting consequences of his action an increasing percentage of the time, accepting limits set by an adult authority figure an increasing percentage of the time, and initiating appropriate interaction with his peers an increasing

percentage of the time.  (Id. at 130-32.)  He was to receive 300 minutes each week of special education by the resource teacher.  (Id. at 133.)  This would place him outside the regular class for less than 21% of the time.  (Id. at 134.)

His report card for the third grade included a teacher's comment in the first quarter that there had been no significant improvement in his behavior, in the second quarter that his behavior had a significant impact on his academic achievement, and in the third quarter that his behavior had improved.  (Id. at 102-03.)

There are no school records from the fourth and fifth grades.

Plaintiff's first quarter report card for the sixth grade, the 2005/2006 school year, listed a "D" or "D-" in all academic areas.  (Id. at 177.)  The teacher comments are illegible.  (Id. at 178-79.)  In the four beginning months of the school year, Plaintiff had been suspended three times for a total of six days.  (Id. at 180.)  Once was for using profanity, once for fighting, and once for refusing to follow directions.  (Id.)  In addition to the days he had been suspended, he was also absent for seven days.  (Id. at 181.)

Plaintiff's medical records began in February 2003, when he was in the third grade.

Thomas Vogel, Psych., a clinical psychologist, with Grace Hill Neighborhood Health Centers, Inc. ("Grace Hill") first saw Plaintiff on February 19, 2003.  (Id. at 200.)  Plaintiff was described to him as very active and aggressive, and as having been suspended from school multiple times.  (Id.)  He had had symptoms of ADHD, and possibly oppositional defiant disorder ("ODD"), since first grade.  (Id.)  Dr. Vogel referred Plaintiff to R. Edmond, M.D.,

for medication and scheduled another appointment with Ms. Woolens and Plaintiff in two weeks to see Plaintiff's response to medication.  (Id.)

Dr. Edmond, also with Grace Hill, then saw Plaintiff.  (Id. at 197-99.)  He noted Ms. Woolens' report that Plaintiff had had symptoms of ADHD since kindergarten or first grade. (Id. at 198.)  There had been no previous diagnosis of ADHD.  (Id.)  Plaintiff had no acute or chronic health problems.  (Id.)  His father was 45 years old and might have ADHD problems. (Id.)  Dr. Edmond prescribed 36 milligrams of Concerta.  (Id. at 197, 199.)

When Dr. Vogel saw Plaintiff and his parents[5] on March 3 he noted that it was the first day that Plaintiff had taken his medication.  (Id. at 196.)  He told Plaintiff and his parents that it took time to see if the medication was working.  (Id.)

On March 19, Dr. Edmond increased Plaintiff's dosage of Ritalin to 15 milligrams three times a day.  (Id. at 194-95.)  Plaintiff was noted to be cooperative and responsive during the visit.  (Id. at 194.)  Dr. Edmond discussed with Plaintiff and his mother the medications and the consequences of increasing it.  (Id. at 195.)  That same day, Mr. Vogel saw Ms. Woolens and Plaintiff.  (Id. at 193.)  Ms. Woolens reported that she felt that Plaintiff's teacher, Mr. Gist, was negative towards Plaintiff.  (Id.)  Mr. Vogel made a note to speak with the teacher after spring break.  (Id.)

He did so, and on April 17 noted that Mr. Gist had reported that, overall, Plaintiff's medication had helped, but he still had some difficulty.  (Id. at 192.)  In comparison to his previous behavior, Plaintiff was much better.  (Id.)  In comparison to the other children, "he

_____

[5]Elsewhere in the record it is noted that Plaintiff's father had little contact with him.

still stood out." (Id.)  He was a "little more focused, but still need[ed] supervision," especially if the teacher was not present.  (Id.)  Mr. Gist wondered if Ms. Woolens did not let Plaintiff get away with more than he should and if Plaintiff was able to manipulate her.  (Id.)  Mr. Vogel further noted that Ms. Woolens had two pills left but did not want Plaintiff to miss the testing; she was to try to pick up more medication.  (Id.)

Four days later, Dr. Edmond saw Plaintiff.  (Id. at 191, 201.)  He noted that Plaintiff's mother reported that the medication did not appear to be effective in the evening, and she was not sure if it was at school.  (Id. at 191.)  No ADHD report was available.  (Id.)  Plaintiff was described as cooperative and responsive.  (Id. at 201.)  His dosage of Ritalin was increased to 20 milligrams three times a day.  (Id.)

Plaintiff saw Drs. Edmond and Vogel on June 16.  (Id. at 225-29.)  Dr. Edmond noted that Plaintiff was doing well on the Concerta, although he again stressed the importance of being compliant with taking the medication.  (Id. at 225, 227.)  He also noted that Plaintiff would be attending summer school to get help with his reading.  (Id. at 227)  Dr. Vogel noted that Plaintiff had been promoted to the fourth grade.  (Id. at 226.)

Plaintiff saw Dr. Edmond on July 14.  (Id. at 219-20, 224.)  Dr. Edmond noted that there was some question about whether Plaintiff was always taking his medication.  (Id. at 219.)  Plaintiff had formerly been resistant to swallowing the medication.  (Id.)  Dr. Edmond suggested grinding it up and putting it in applesauce.  (Id.)  He discussed with Plaintiff the importance of taking the medication in order to help himself.  (Id.)  Dr. Edmond hoped that

Plaintiff would try to be more compliant in the future. (Id.) He also noted that Plaintiff was receiving "3's" at school. (Id.)

That same day, Plaintiff and his parents met with Dr. Vogel. (Id. at 223.) They were not sure if Plaintiff was taking his medication every day. (Id.) Dr. Vogel emphasized the necessity of doing so. (Id.) Dr. Vogel also met with Plaintiff's teachers. (Id. at 222.) It was noted that Plaintiff's behavior was fine until 11:00 in the morning; most of his problems were from 11:00 to 1:00. (Id.) Plaintiff's parents questioned whether Plaintiff was receiving his medication at 11:00; Dr. Vogel would discuss with the physical education teacher whether he would let Plaintiff go get his medication. (Id.)

Progress notes from Grace Hill on October 14 list a plan of behavior management at school and home and family therapy. (Id. at 210.) Dr. Vogel went to Plaintiff's school on October 30, noting that the teachers reported that Plaintiff continued to be disruptive in class and was better in special education classes and small classroom environments. (Id. at 212.) Plaintiff had difficulty working independently. (Id.) His school teachers felt that Plaintiff was a bright child and was capable of doing regular work. (Id.) Ms. Woolens reported that Plaintiff felt he was stupid when he could not read. (Id.)

Dr. Edmond saw Plaintiff on November 10. (Id. at 213, 215.) He described Plaintiff as well-behaved and appropriate. (Id. at 213.) Dr. Vogel also saw Plaintiff, noting that Plaintiff was taking his medication when he wanted to, which was usually at school. (Id. at 214.)

Progress notes from November 20 list the consistency of taking medication to be a problem. (Id. at 208.) Plaintiff's Global Assessment of Functioning score[6] ("GAF") was between 50[7] and 55.[8] (Id.) Plaintiff was seen again at Grace Hill on December 10 for his ADHD. (Id. at 209.)

The next record from Grace Hill is in March 2005. (Id. at 261-64.) His dosage of Concerta was 36 milligrams in the morning. (Id. at 261.) Dr. Edmond noted that Plaintiff's ADHD was controlled on that dosage; he emphasized compliance with the medication. (Id. at 262.) Plaintiff and his mother also met with Dr. Vogel. (Id. at 264.) Plaintiff had been suspended for two days the week before for disobeying and verbally confronting a teacher. (Id.) Dr. Vogel asked Ms. Woolens to set up a meeting at school. (Id.)

Accordingly, Dr. Vogel met with Plaintiff's principal and teacher in April.[9] (Id. at 266.) The principal reported that Plaintiff had not been "that much of a problem," but wished that

---

[6]"According to the [Diagnostic Manual], the Global Assessment of Functioning Scale is used to report 'the clinician's judgment of the individual's overall level of functioning.'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n. 2 (8th Cir. 2003). See also **Bridges v. Massanari**, 2001 WL 883218, *5 n.1 (E.D. La. July 30, 2001) ("The GAF orders the evaluating physician to consider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." (interim quotations omitted)).

[7]A GAF score between 41 and 50 is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Diagnostic Manual at 34.

[8]A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." Diagnostic Manual at 34 (alteration added).

[9]Ms. Woolens was unable to make the meeting.

Plaintiff's teacher would bring him to the principal's office more often. (Id.) The teacher reported that Plaintiff had been "very good over the past two weeks." (Id.)

In May, Dr. Edmond noted that Plaintiff was moving to the sixth grade the next year. (Id. at 267.) He was also going to summer school. (Id.) His dosage of Concerta remained at 36 milligrams in the morning. (Id.) Compliance was emphasized. (Id. at 268.) The same dosage of Concerta was prescribed at Plaintiff's visits to Dr. Edmond in June and July. (Id. at 270-75.) Plaintiff was reported to be doing well in summer school. (Id. at 270.) As previously, compliance was emphasized at each of the two visits. (Id. at 271, 274.)

The ALJ also had before him questionnaires completed by Plaintiff's teachers and the reports of evaluations by examining and non-examining consultants.

The former begins with the questionnaire, submitted pursuant to Plaintiff's SSI application, completed in May 2003 by Plaintiff's third grade teacher, Gregory Gist. (Id. at 164-69.) Mr. Gist noted that Plaintiff was functioning at a second grade level in reading, math, and written language. (Id. at 164.) He was seen daily in resource special education. (Id.) He had an unusual degree of absenteeism due to his suspensions for anti-social behavior. (Id.) Plaintiff had an obvious problem in the ten activities in the domain of acquiring and using information. (Id. at 165.) In the thirteen activities in the domain of attending and completing tasks, Plaintiff had a very serious problem in eight, a serious problem in one, an obvious problem in three, and a slight problem in one. (Id. at 166.) In the thirteen activities in the domain of interacting and relating with others, Plaintiff had a very serious problem in nine, a serious problem in one, an obvious problem in one, a slight problem in one, and no

problem in one. (Id. at 167.) In the domain of moving about and manipulating objects, Plaintiff had a very serious problem in two of the seven activities and a slight problem in the remaining seven. (Id. at 168.) In the domain of caring for himself, Plaintiff had a very serious problem in six of the ten activities, including in handling frustration appropriately, a serious problem in one, an obvious problem in one, and a slight problem in two. (Id. at 169.)

In April 2006, the spring of Plaintiff's sixth grade year, his math teacher completed a teacher questionnaire. (Id. at 184-88.) In the six listed activities in the domain of acquiring and using information, Plaintiff was described as functioning at a four on a five-point scale, with a five reflecting a very serious problem, in all six activities. (Id. at 184.) In the domain of interacting and relating with others, Plaintiff was rated as being a three – "[n]oticeably interferes with academic or social success" – in five of the eleven activities, including following class rules and provoking peers. (Id. at 187.) He was assessed as having no problem in the remaining six activities, including getting along with other children and making and keeping friends. (Id.) He sometimes had to be disciplined for using profanity. (Id.) In the nine activities associated with the domain of attending and completing tasks, Plaintiff was considered to be a four in all nine. (Id. at 188.) The teacher noted that he had difficulty staying focused and on task. (Id.) The teacher also noted that she did not know whether Plaintiff had been prescribed or was taking any medication. (Id. at 186.)

The consultants' reports begin with that of a June 2003 evaluation of Plaintiff by L. Lynn Mades, Ph.D., a licensed psychologist. (Id. at 231-35.) Plaintiff reported that he got in less trouble when he took his medication. (Id. at 231.) His mother reported that he had been

suspended five times in the last year for inappropriate behavior. (Id.) He had similar behavioral problems at home. (Id.) She first noted the problems last year. (Id.) Plaintiff had been diagnosed with ADHD in February and had improved with treatment. (Id.) Ms. Woolens "admit[ted] that 'every now and then' [Plaintiff] may miss one dose, when it was noted that there were several pills left from a prescription filled one month ago." (Id. at 231-32.) Dr. Mades described Plaintiff, in part, as follows:

> . . . Attitude was generally cooperative, although he would refuse to respond on occasion. Expression was alert, and eye contact was variable. Motor activity was overly active, with fidgeting and crawling under the desk. . . .
>
> Ability to relate: [Plaintiff] was spontaneous, coherent, relevant, and logical.

(Id. at 232.) Dr. Mades expressed concern that "so much medication was left from a one-month-old prescription." (Id. at 233.) She summarized her findings after examining Plaintiff:

> [Plaintiff] presents with complaints of behavior problems. His mother and teacher reports [sic] behaviors consistent with ADHD, and his mother noted improvement on medication. It appears questionable, however, that [Plaintiff] is taking his medication consistently. Reported delays in learning may be attributable to interference from behavior problems. No evidence of mood disturbance or thought disturbance was noted during today's examination, and there was evidence of mild to moderate behavioral impairment that would limit the claimant in appropriate school participation in a regular classroom.

(Id. at 234.) Dr. Mades' assessment was that Plaintiff's school activity, currently moderately affected by his behavioral impairment, "would likely improve with consistent compliance with education" and his ability to relate to others, including peers and teachers, would be mildly

impaired at worst when on medication.  (Id. at 235.)  She assessed his GAF at 70.[10]  (Id. at 234.)

Citing Dr. Mades' report and the medical records, James W. Lane, Ph.D., completed a Childhood Disability Evaluation Form ("CDEF") the following month.  (Id. at 238-45.) Plaintiff's impairment was ADHD and was considered severe, but not of listing-level severity. (Id. at 238.)  Specifically, the ADHD resulted in a less than marked limitation of Plaintiff's ability to acquire and use information, to attend and complete tasks, to interact and relate with others, and to care for himself.  (Id. at 240-41.)  His ADHD resulted in no limitation in his ability to move about and manipulate objects or in his health and physical well-being.  (Id. at 241.)

In February 2004, Tom Davant Jones, Ph.D., a licensed psychologist, evaluated Plaintiff.  (Id. at 246-50.)  Ms. Woolens reported that Plaintiff's dosage of Ritalin had recently been increased and that Plaintiff's behavior had improved accordingly.  (Id. at 246.)  Plaintiff had had no suspensions in the current school year, but had had "a number of 'Parental appearances,' which means that the mother must accompany [Plaintiff] back to school after an infraction to allow him to come back."  (Id. at 247.)  He had had approximately ten suspensions in the 2002/2003 school year.  (Id.)  Unlike in the past, Plaintiff had not hit anyone at school and had not cursed his teachers, although he had talked back.  (Id.)  He had

_____

[10]A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  Diagnostic Manual at 34 (alteration added).

not left the classroom without permission, but had roamed the hallways. (Id.) He had talked back to his mother, but had not cursed her. (Id.) On examination, Plaintiff had "some increased motor activity and he fidgeted throughout the interview" and occasionally interrupted conversation. (Id. at 248.) He was otherwise "generally cooperative, happy and outgoing[.]" (Id.) His school functioning was considered to be moderately impaired, although it was noted that his behavior had improved with the increased dose of medication. (Id. at 249.) The diagnosis was a learning disorder, by history, and ADHD, by history. (Id.) His current GAF was 60.[11] (Id. at 250.) His ability to relate to others was assessed as being moderately impaired. (Id.)

The same month, Sherry Bass, Ph.D., completed a CDEF on behalf of Plaintiff. (Id. at 252-57.) Her assessment of Plaintiff's limitations mirrored that of Dr. Lane. (Id. at 255-56.)

### The ALJ 's Decision

After summarizing in detail the relevant evidence before him, the ALJ found, as follows:

> [Plaintiff] is of average intelligence, and has no clearly diagnosed learning disorder. As Dr. Mades surmised, his poor grades are probably more the result of disciplinary infractions, and consequent poor effort. All of [Plaintiff's] teachers, as well as doctors and even he and his mother, admit that his attentiveness and social behavior are better controlled when he takes his medication. To the extent that [Plaintiff's] behavior is ever less than optimally controlled by medication, it is because of noncompliance on his part. A claimant who fails without good cause to follow prescribed medication treatment that may restore his normal functioning may be found not disabled. [Plaintiff] has no good excuse for noncompliance. . . .

---

[11] See note 8, supra.

Actually, in this case [Plaintiff's] behavior is not all that uncontrolled, medication compliance or not. The instances of school suspension are [sic] really all that frequent. [Plaintiff] has not had, and has presumably not needed, frequent medical attention. There is a large gap in outpatient treatment initiated by [Plaintiff] or his mother between November 2003 and March 2005, and the most recent medical records, which are now a year old, show his ADHD to be controlled with Concerta. He has never required hospitalization or any other kind of drastic treatment or intervention for his behavior disorder.

The allegation by [Plaintiff's] mother that [Plaintiff] has marked or extreme functional limitations is not credible. At worst, [Plaintiff] has less than marked limitations in acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for himself, and even those functions would probably be even less limiting with better medication compliance.

(Id. at 17.)

Accordingly, the ALJ concluded, Plaintiff was not disabled within the meaning of the Act. (Id.)

## Legal Standards

Title 42 U.S.C. § 1382c(3)(C)(i) provides that "[a]n individual under the age of 18 shall be considered to be disabled for purposes of [SSI] if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."

The Commissioner's decision denying a child SSI benefits is reviewed by this Court to determine whether it is supported by substantial evidence. **Rucker v. Apfel**, 141 F.3d 1256, 1259 (8th Cir. 1998); **Clark v. Apfel**, 141 F.3d 1253, 1255 (8th Cir. 1998); **Frankl v. Shalala**, 47 F.3d 935, 937 (8th Cir. 1995). "Substantial evidence is less than a preponderance,

but enough that a reasonable mind might accept it as adequate to support a decision." **Cox v. Apfel**, 160 F.3d 1203, 1206-07 (8th Cir. 1998). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must also take into account whatever in the record fairly detracts from that decision. **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999); **Baker v. Apfel**, 159 F.3d 1140, 1144 (8th Cir. 1998); **Bryant v. Apfel**, 141 F.3d 1249, 1250 (8th Cir. 1998). The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion. **Tate v. Apfel**, 167 F.3d 1191, 1196 (8th Cir. 1999); **Pyland v. Apfel**, 149 F.3d 873, 876 (8th Cir. 1998). See also **Reed v. Sullivan**, 988 F.2d 812, 815 (8th Cir. 1993) ("[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." (interim quotations omitted)).

Under the Act, as amended by the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, the ALJ inquires into (1) whether the child was currently engaged in substantial gainful activity; (2) whether the child suffered severe impairments or a combination of severe impairments; and (3) whether the child's impairments met or equaled any listed impairments. **Bryant**, 141 F.3d at 1251. If the ALJ finds at step two of the evaluation that a child's impairments are severe, then the question at step three is whether those severe impairments cause "marked and severe functional limitations" and whether they meet the duration requirement of at least one year. 20 C.F.R. § 416.924(d). "An impairment(s) causes marked and severe functional limitations if it meets or medically equals

the severity of a set of criteria for an impairment in the listings, or if it functionally equals the listings." Id. See also 20 C.F.R. § 416.924(a); 20 C.F.R. Part 404, Subpart P, Appendix 1, Part B.

## **Discussion**

Plaintiff argues that the Commissioner's adverse decision is not supported by substantial evidence on the record as a whole because (a) the ALJ failed to properly consider the observations by disinterested third parties; (b) the ALJ did not go through a function-by-function analysis of the effect of Plaintiff's impairment; and (d) the ALJ did not give the proper weight to the GAF assessment by Dr. Vogel. The Commissioner disagrees.

Observations by Third Parties. As noted by Plaintiff, Social Security Ruling 06-03p considers teachers and other educational personnel as "non-medical sources" who may have close contact with claimants and who may be "valuable sources of evidence for assessing impairment severity and functioning." Social Security Ruling 06-03p, 2006 WL 2329939, *3 (S.S.A. 2006). Such sources often "have close contact with the individuals and have personal knowledge and expertise to make judgments about their impairment(s), activities, and level of functioning over a period of time." Id. The Ruling further provides that:

> For opinions from sources such as teachers, counselors, and social workers . . . and other non-medical professionals, it would be appropriate to consider such factors as the nature and extent of the relationship between the source and the individual, the source's qualifications, the source's area of specialty or expertise, the degree to which the source presents relevant evidence to support his or her opinion, *whether the opinion is consistent with other evidence, and any other factors that tend to support or refute the opinion*.

Id. at *5 (alteration added) (emphasis added).

Plaintiff is incorrect, however, in his conclusion that the ALJ did not follow SSR 06-03p. In support of this conclusion, Plaintiff first cites the March 2001 observations by his teacher. These observations were made before Plaintiff was diagnosed with ADHD and, consequently, before he was placed on any medication. Moreover, behaviors described in those observations, e.g., being easily distracted and fidgeting, are clearly indicative of ADHD and were lessened, if not resolved, when Plaintiff took the appropriate medication. Similarly, the observations in the 2003 IEP were made before Plaintiff's ADHD diagnosis and treatment. The next quarter of that school year, after the diagnosis, saw an improvement in Plaintiff's behavior.

Plaintiff also cites the observations of his third-grade teacher, Mr. Gist, reported in the spring of that school year. This is also unavailing. Much of the observations of Mr. Gist cited by Plaintiff predate the ADHD diagnosis and treatment and are followed by Mr. Gist's report to Dr. Vogel in April that Plaintiff's medication had helped "overall." Although Plaintiff continued to have some problems, it is noteworthy that he had not started taking his ADHD medication until March and that, as of April, he had yet to take all the prescribed doses. And, Ms. Woolens opined that Mr. Gist was negative toward Plaintiff.

Plaintiff was suspended in the fall of the 2005/2006 school year for fighting, insubordination, and showing disrespect. This clearly was after his ADHD diagnosis. There are no medical records, however, during this time period. The medical records that were before the ALJ indicate that when Plaintiff was being treated for ADHD the treatments and prescription refills occurred on a monthly basis. Similarly, the observations of Plaintiff's math

teacher in April 2006 were made during a period when there were no medical records reflecting any treatment of Plaintiff's ADHD. As noted by the ALJ, Plaintiff's behavior improved when he was being treated.

The foregoing observations of Plaintiff's behavior in 2001, Mr. Gist's 2003 assessment, the 2005 suspensions, and the teacher's 2006 observations were all noted in the ALJ's decision. Plaintiff argues that the observations were not "considered" and the suspension notices were not considered "adequately." Insofar as these arguments challenge the conclusion drawn by the ALJ, they are unavailing because that conclusion is supported by substantial evidence on the record as a whole. Insofar as these arguments challenge the detail in which observations and notices were discussed, it is a deficiency that had not bearing on the outcome. See **Hepp v. Astrue**, 511 F.3d 798 (8th Cir. 2008) (holding that "an arguable deficiency in opinion-writing technique does not require [the court] to set aside an administrative finding when that deficiency had no bearing on the outcome") (interim quotations omitted) (alteration added)

Function-By-Function Analysis. Plaintiff next takes issue with the ALJ's failure to engage in a function-by-function analysis of the affect of his impairment in the six functional areas. It is clear from the ALJ's decision, however, that he considered all the factors made relevant by 20 C.F.R. § 416.926a. His failure to specifically cite the six functional areas – areas in which neither non-examining consultant found Plaintiff to be markedly limited – is not fatal.

Dr. Vogel's GAF Assessment.  In November 2003, Dr. Vogel assessed Plaintiff as having a GAF of between 50 and 55.  The former is indicative of any serious impairment in school functioning, see note 7, supra, and the latter of moderate difficulty, see note 8, supra. As noted by the Commissioner, this GAF is made without explanation or citation to any record or current behavioral complaint.  Indeed, the contemporaneous record cites a disconnect between the behavioral management program at school and at home and a problem with the consistency with which Plaintiff took his ADHD medication.  On the other hand, the GAFs listed by Drs. Mades and Jones were made after examination and were supported by a discussion in their respective reports.  See **Hudson ex rel. Jones**, 345 F.3d at 667 (finding it significant that examining consultant was the only witness to offer an opinion based on record as a whole, including claimant's medical records and educational records)

Plaintiff's failure to take his medication is a constant theme throughout the record. Plaintiff argues that this failure has been given undue weight.  It has not.  The record indicates that Plaintiff's behavior improved when he took his medication.  For instance, Ms. Woolens reported to Dr. Jones in February 2004 that Plaintiff's behavior had improved on an increased dosage of Ritalin, that he had not hit anyone at school, and that he had not been suspended, in contrast to the previous school year when he had been suspended five times.  At a time when there is no record of Plaintiff receiving medical attention for his ADHD,[12] in the fall of the 2005/2006 school year, he was again being suspended.

---

[12]The Court notes that the 2005 records were requested in November 2005 and that the ALJ held the record open for 30 days after the December 21, 2005, hearing for the receipt of additional records.  No medical records were submitted for any treatment after August 2005.

Thus, the record establishes that Plaintiff's behavior improved, and did not markedly limit his functioning, when he was being treated and was compliant with his medication. "'If an impairment can be controlled by treatment or medication, it cannot be considered disabling.'" **Schultz v. Astrue**, 479 F.3d 979, 983 (8th Cir. 2007) (quoting Brown v. Barnhart, 390 F.3d 535, 540 (8th Cir. 2004)).

## Conclusion

For the foregoing reasons, the Court finds that there is substantial evidence in the record as a whole, including a consideration of the evidence that detracts from the ALJ's decision, to support the Commissioner's conclusion that Plaintiff is not disabled within the meaning of the Social Security Act. Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and this case is DISMISSED.

An appropriate Judgment shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this 28th day of February, 2008.